THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                          Mailed:

November 14, 2013                                 September 29, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*McDonald's Corp.*
*v.*
*McSweet, LLC*

_____

Consolidated Opposition Nos. 91178758 and 91192099 to
Application Serial No. 78947247 filed August 8, 2006
and Application Serial No. 77722272 filed April 9, 2009

_____

Robert E. Browne, John A. Cullis, Lawrence E. James, Jr., and M. R. Turner of
Neal, Gerber & Eisenberg, LLP for McDonald's Corporation.

Katherine Hendricks and Caitlin A. Bellum of Hendricks & Lewis, PLLC for
McSweet, LLC.

_____

Before Kuhlke, Gorowitz and Masiello, Administrative Trademark Judges.

Opinion by Gorowitz, Administrative Trademark Judge:

McSweet, LLC (Applicant) filed applications to register the mark MCSWEET

for, as amended, "pickled gourmet vegetables, namely, pickled cocktail onions,

pickled garlic, and pickled, marinated olive medley"[1] and "pickled asparagus."[2]

---

[1] Application Serial No. 78947247, filed August 8, 2006, on the basis of Section 1(a) of the
Trademark Act, alleging 1990 as the date of first use anywhere and first use in commerce.

McDonald's Corporation (Opposer) opposed both applications on the grounds of likelihood of confusion, dilution, and lack of ownership. Opposer alleges that it is the owner of a family of marks consisting of the prefix "MC" followed by either a generic or descriptive term; that both its mark MCDONALD'S and its "MC" family of marks are famous; and that it is the owner of the following registrations:[3]

- Reg. No. 1947099 for the mark MC for restaurant services (issued on January 9, 1996; renewed January 9, 2006);

- Reg. No. 743572 for the mark MCDONALD'S for restaurant services (issued on January 8, 1963; third renewal January 8, 2013);

- Reg. No. 1065885 for the mark MC CHICKEN for cooked chicken for consumption on or off the premises (issued on May 17, 1977; second renewal May 17, 2007);

- Reg. No. 1266500 for the mark MC DOUBLE for a sandwich for consumption on or off the premises (issued on February 7, 1984; renewed February 7, 2004);

- Reg. No. 1315979 for the mark MCRIB for a sandwich for consumption on or off the premises (issued on January 22, 1985; renewed January 22, 2005);

- Reg. No. 1369360 for the mark MCMUFFIN for breakfast food combination sandwich for consumption on or off the premises (issued on November 5, 1985; renewed November 5, 2005);

---

[2] Application Serial No. 77722272, filed April 24, 2009, under Section 1(a) of the Trademark Act, alleging September 4, 2008 as the date of first use anywhere and first use in commerce.

[3] Additional registrations were pleaded in the original Notice of Opposition. As discussed, *infra,* in its response to Opp. No. 91192099, Applicant counterclaimed to cancel a number of the registrations. The registrations that were cancelled are not included in this list of registrations.

- Reg. No. 1450104 for the mark MCNUGGETS for restaurant services (issued on July 28, 1987; renewed January 8, 2013);

- Reg. No. 2805109 for the mark MCFLURRY for dairy based dessert products namely ice cream and frozen confections (issued on January 13, 2004; §8 Declaration accepted, §15 Declaration acknowledged);

- Reg. No. 3151707 for the mark MCGRIDDLES for hot cakes (issued on October 3, 2006; §8 Declaration accepted, §15 Declaration acknowledged);

- Reg. No. 3201441 for the mark MCCAFE for beverages made of coffee beans, hot chocolate, pastries, muffins, cakes, cookies, biscuits and sandwiches (issued on January 23, 2007; §8 Declaration accepted, §15 Declaration acknowledged); and

- Reg. No. 3407069 for the mark MCSKILLET for breakfast entrees consisting of eggs, meat, cheese and vegetables (issued on January 23, 2007; §8 Declaration accepted, §15 Declaration acknowledged).

Applicant filed answers to the notices of opposition in both proceedings, denying all salient allegations, and asserting five affirmative defenses. In Opposition No. 91192099, Applicant also filed counterclaims for cancellation of the following pleaded registrations, on the ground of abandonment: Reg. No. 1118362 for the mark MCPIZZA; Reg. No. 1450104 for the mark MCNUGGETS; Reg. No. 1541797 for the mark MCCOLA; Reg. No. 1552143 for the mark MCCHILI; Reg. No. 1566184 for the mark MCCOOKIE; Reg. No. 1943180 for the mark MCCOFFEE; and Reg. No. 2289608 for the mark MCVEGGIE BURGER. On December 9, 2009, Opposer voluntarily surrendered its registrations for the marks MCPIZZA, MCCOLA, MCCHILI, MCCOOKIE, MCCOFFEE, and MCVEGGIE BURGER (i.e., all of the registrations except for MCNUGGETS), after which, on March 4, 2010, judgment

was entered in favor of Applicant on the respective counterclaims. In its answer to the remaining counterclaim, Opposer denied the allegation that it had abandoned the mark MCNUGGETS. No further action was taken by Applicant with respect to this counterclaim -- Applicant neither filed evidence in support of this claim nor mentioned it in its brief. Accordingly, the counterclaim is dismissed.

Proceedings were consolidated on January 21, 2011. The case has been fully briefed and an oral hearing was held on November 14, 2013. We sustain the opposition on the grounds of likelihood of confusion and dilution.[4]

**The Record and Evidentiary Objections.**

The record includes the pleadings, and by operation of Trademark Rule 2.122(b), 37 CFR § 2.122(b), both of the application files. The record also includes the following testimony depositions and their accompanying exhibits proffered by Opposer:

1. Peter Sterling, Opposer's Vice President of Marketing Services (Sterling Test.);

2. Jennifer O'Malley, Opposer's Managing Counsel with the Intellectual Property and Marketing Practices Group (O'Malley Test.);

3. Kara Kizior, Opposer's Director of U.S. Business Integration (Kizior Test.);

4. Ross Oakland, Operations Manager for McDonald's Restaurants in Walmart stores (Oakland Test.);

5. Jill Cassada, Opposer's Manager Global Marketing (Cassada Test.);

---

[4] Because we are sustaining the opposition on these grounds, we do not need to consider Opposer's claim that Applicant did not own the opposed mark at the time it filed the applications.

6. Phillip Johnson, Chief Executive Officer of Leo J. Shapiro & Associates, Opposer's expert witness, (Johnson Test.); and

7. Robert Murzin, investor in Automated Sales (Murzin Test.);

and the following documents submitted under notices of reliance: status and title copies of Opposer's pleaded registrations; Applicant's responses to portions of Opposer's discovery requests; portions of the discovery depositions of: James McCaslin, Applicant's Fed. R. Civ. P. 30(b)(6) designee (McCaslin Depo.); Jeffrey Bergman, consultant doing business as Bergman Culinary Concepts (Bergman Depo.); Craig Cayton, specialties grocery buyer for Crown Pacific Fine Foods (Cayton Depo.); Gillian Christie, of Christie Communications (Christie Depo.); Barbara Murray, relative of Leo McIntyre and executrix of his estate (Murray Depo.); George Wolf, officer of G. Wolf Enterprises, d/b/a Wolf Pack, a canning company (Wolf Depo.); and Lori Robinson of McCormick & Company (Robinson Depo.);[5] copies of Board and Court decisions; title and status copies of Opposer's pleaded registrations, as set forth *supra*; and third party applications, registrations and webpages.

The record also includes the following testimony and accompanying exhibits proffered by Applicant:

---

[5] Absent a stipulation, discovery depositions may be offered in evidence by an adverse party only of a party or of anyone who at the time of taking the deposition was an officer, director or managing agent of a party, or a person designated by a party pursuant to Rule 30(b)(6) or Rule 31(a) of the Federal Rules of Civil Procedure. Trademark Rule 2.120(j)(1). The parties stipulated to the admission of the discovery depositions of non-party witnesses as testimony on July 7, 2011. Accordingly, we accept the portions of the discovery depositions proffered by Opposer.

1. Testimony Deposition of James McCaslin (McCaslin Test.);

2. Testimony Deposition of Walter McKenna, Controller of Specialty Brands of America (McKenna Test.);

3. Testimony Deposition of Mark Fields, Senior Category Manager and Business Development Manager of Sturm Foods (Fields Test.);

4. Testimony Deposition of Thomas Czoschke, Senior Brand Manager for U.S. Retail Potatoes, of McCain Foods USA (Czoschke Test.);

5. Stipulated Affidavit of Vanessa Maskal, Executive Vice President of Sales and Marketing for B&G Foods, Inc. (Maskal Aff.);[6]

6. Stipulated Affidavit of Paul McIlhenny, Chairman of the Board and Chief Executive Officer of McIlhenny Company (McIlhenny Aff.);[7]

and the following documents introduced under notices of reliance: Opposer's responses to portions of Applicant's discovery requests; articles and information regarding Opposer; third-party registrations; portions of printed publications regarding the meaning of McSweet; printouts of websites from the Internet reflecting use of "MC" formative marks for food products;[8] and portions of the discovery depositions (which were not submitted by Opposer) of Jeff Berman, Barbara Murray, George Wolf, Craig Cayton, Lori Robinson, and Gillian Christie.

Each party objected to and moved to strike extensive portions of evidence proffered by the other party. Opposer categorizes the testimony and documentary

---

[6] Stipulation filed on May 4, 2012.

[7] Stipulation filed on May 4, 2012.

[8] All of the webpages displayed both URLs and the dates on which they were accessed; as such, they are admissible. *See Safer Inc. v. OMS Invs. Inc.,* 94 USPQ2d 1031, 1038 (TTAB 2010).

evidence to which it objects as: (1) testimony regarding statements purportedly made by Leo McIntyre to establish that Mr. McIntyre transferred the MCSWEET onion business to Applicant and that Mr. McIntyre used the MCSWEET mark prior to 1999; (2) Internet printouts containing negative statements about Opposer; (3) Internet printouts and trademark registration certificates regarding third-party marks; and (4) other Internet printouts. Applicant objects to the admission of extensive portions of a 179 page exhibit to Opposer's third notice of reliance (Exhibit L).

We have noted the objections and taken them into consideration in allocating the appropriate weight to the evidence. However, as we have frequently done in the past, given the circumstances in this case, "we choose not to make specific rulings on each and every objection. … Ultimately, while we have considered all of the evidence and arguments of the parties, we have primarily relied on the evidence discussed herein." *See Hunt Control Sys. Inc. v. Koninklijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011).

**Discussion.**

Opposer has been using the name McDonald's in association with its restaurant services since 1955. Sterling Test., 6:12-21. Since 1973, Opposer has been using "MC" formative marks in connection with food, collateral merchandise, and services. Sterling Test., 10:22 - 24, O'Malley Test., 9:6 – 10:9, Cassada Test., 7:20-8:11. Opposer's family of marks was created by combining the prefix "MC" with a suffix which is either generic or descriptive of Opposer's goods or services to "give

consumers immediate information about the product that it's associated with [McDonald's] and the attributes that [McDonald's] believe[s] that conveys to consumers." *See* O'Malley Test., 9:10-19 and 14:1-11.

Applicant has used the mark MCSWEET in connection with pickled gourmet vegetables since at least as early as 2006,[9] and is seeking to register the mark for "pickled gourmet vegetables, namely, pickled cocktail onions, pickled garlic, and pickled, marinated olive medley," which are included in App. Ser. No. 78947247 filed on August 8, 2006, and for "pickled asparagus," which is included in App. Ser. No. 77722272 filed on April 24, 2009. Applicant alleges prior rights, through a predecessor, in connection with pickled cocktail onions. McCaslin Test., 14:24 – 15:2.

**Standing.**

Because Opposer has made its pleaded registrations of record, and further has shown, by submitting evidence of use of the pleaded marks in connection with food and restaurant services, that it has a personal stake in the outcome of this proceeding, we find that Opposer has established its standing. *See Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1727 (Fed. Cir. 2012); *Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

---

[9] McCaslin Test., 109:10 - 15 and 110:15-19.

**Priority.**

Priority is not at issue here in view of Opposer's submission, with its notice of reliance, of its pleaded registrations for the marks. *See Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1167 (TTAB 2001); *King Candy Co. v. Eunice King's Kitchen,* 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

**Likelihood of Confusion.**

Our determination of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). One of the factors the *du Pont* court listed as relevant is "[t]he variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." 177 USPQ at 567. If an opposer is found to own a family of marks for a range of goods, that is an *additional* factor—beyond the similarities between applicant's mark and goods, and any *one* of opposer's marks and goods—weighing in favor of a likelihood of confusion.

In this case, Opposer alleges that there is a likelihood of confusion between its family of marks consisting of the prefix "MC" combined with a suffix which is either generic or descriptive of its goods or services,[10] and Applicant's mark

---

[10] Jennifer O'Malley, Opposer's Managing Counsel with the Intellectual Property and Marketing Practices Group, testified that "McDonald's has an extensive family of 'MC' trademarks. Obviously it started with the McDonald's mark back in the mid – '50s and then over the years we've had hundreds of applications and registrations for various MC formative marks. And by MC formative marks, I mean marks that consist of the MC prefix

MCSWEET for gourmet pickled vegetables. Opposer also alleges that there is a likelihood of confusion between its mark MCDONALD'S and Applicant's mark. In our analysis of the likelihood of confusion, we focus on the family of marks claim, but have considered the fame of the MCDONALD'S mark as contributing to the fame of the family, notwithstanding that MCDONALD'S does not exhibit the family characteristic of coupling the "MC" prefix with a descriptive or generic term.

**Does Opposer own a family of "MC" marks?**

We begin our analysis by determining whether Opposer owns a "family of MC marks." The Federal Circuit has defined a family of marks as follows:

> A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods.

*J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991). In that case, the Court found that "McDonald's showed extensive usage and promotion of various marks using the 'Mc' formative in association with the McDONALD's mark"[11] and thus McDonald's owned a family of marks "wherein the 'MC' formative is combined with a generic name." *Id.* at 1891. In 1995, the Board held that McDonald's had a family of marks "which combine the

---

followed by a generic or descriptive term that refers to the product or the services or some attribute of the product or service." O'Malley Test., 9:10-19.

[11] *Id.* at 1892.

distinctive 'MC' prefix with a suggestive or descriptive term." *McDonald's Corp. v. McClain*, 37 USPQ2d 1274, 1276 (TTAB 1995). The evidence that established the family, in those cases, also established its fame. In the case before us, Opposer alleges that its family of marks consists of marks wherein the prefix "MC" is combined with a generic or descriptive term. We must determine whether Opposer owns such a family of marks based on the record adduced herein; the findings in the prior cases do not substitute for Opposer's proof in this proceeding that it has a family.

Opposer owns registrations for the mark MC (alone) as well as for the marks MCDONALD'S, MC CHICKEN, MC DOUBLE, MCRIB, MCMUFFIN, MCNUGGETS, MCGRIDDLES, MCCAFE, MCSKILLET, and MCFLURRY. Opposer currently uses all of these marks. Sterling Test., 85:11-22, 90:19-22, 105:7-10, 112:8-14, 114:13-17, 116:3-7, and 117:11-16. MC CHICKEN, MCRIB, and MCMUFFIN are examples of marks in Opposer's asserted family that consist of the "MC" prefix and the generic name of one of the primary ingredients of Opposer's goods. MC DOUBLE, MCSKILLET, and MCGRIDDLES are examples of marks in Opposer's asserted family that consist of the MC prefix and a term that describes a feature (double hamburgers or cooked in a skillet or on a griddle) of Opposer's goods. By contrast, the marks MC, MCDONALDS, and MCFLURRY are not, strictly speaking, members of Opposer's claimed "MC" family of marks because neither "DONALDS" nor "FLURRY" is generic or descriptive of the relevant goods, and the mark MC lacks a generic or descriptive suffix. Nonetheless, these

11

registered marks are capable of reinforcing the association between Opposer and marks that incorporate the prefix "MC."

Opposer operates over 14,000 restaurants across the United States that collectively serve an average of 26 million people every day. *Id.* at 7:1-12.

Opposer has established that it has used and continues to use and promote "MC" formative marks consisting of the prefix "MC" followed by either a generic or descriptive term since the 1995 decision, *McDonald's Corp. v. McClain, supra*; and that consumers associate marks consisting of the "MC" prefix and a generic or descriptive suffix with Opposer. According to witnesses, Opposer's efforts to establish and maintain the "MC" family of marks have been so successful that consumers spontaneously use the "MC" prefix in connection with all of Opposer's products as explained in the following testimony:

> Q. Do you believe that consumers have come to recognize MC plus a generic or descriptive term used for a food product to be a McDonald's mark?
>
> A. So I –absolutely. Absolutely. We—
>
> Q. What's your basis for believing so?
>
> A. So, we believe that consumers put it together because we hear it every day. They come into our restaurant. They refer to our products. They refer to it. They MC everything that we sell, even if we don't.
>
> Frankly, it's become part of the overall lexicon of the population. They MC things all the time to try to create a relationship with McDonald's.
>
> Q. When you refer to "they MC things all the time," can you expound on that a little bit?

> A. So, it's – they come in and we will offer a product like Quarter Pounder with Cheese. The will call it the McQuarter Pounder with Cheese. We will offer a product like a Double Cheeseburger. They'll call it the McDouble Cheeseburger.
>
> Our customers MC everything. They assume the association up front. We sell products – I'll include Sweet Tea here where our customers come in and call it McSweet Tea all the time. We hear from that [sic] our crew. We hear that from our store managers. Our customers tell it to us in focus groups about the use of the word MC.
>
> So, when we talk to them about putting the Mc in front of a product, it's a natural thing for them to hear … And, frankly, they talk about it. Frankly, it's really – it's how they speak to us.

Sterling Test., 12:20-14:12.

Based on the record before us, without regard to the *McDonald's Corp. v. McClain* decision, Opposer has established that, based on its use and promotion of its family of marks, Opposer continues to own a family of marks consisting of the prefix "MC" combined either with a generic term or a descriptive term. This weighs in favor of a finding that confusion is likely.

## Is Opposer's family of "MC" marks famous?

Having found that Opposer owns a family of marks consisting of the prefix "MC" in conjunction with either a generic term or a descriptive term, we now determine whether the "MC" family of marks is famous. In doing so we also consider the fame of the mark MCDONALD'S because the "MC" family was derived from and points back to the mark and as such is integrally related to that mark. "Fame for confusion purposes arises as long as a significant portion of the relevant consuming

13

public … recognizes the mark as a source indicator." *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). This principle applies equally to a family of marks. Fame may be measured indirectly by the volume of sales and advertising expenditures for the goods and services identified by the marks at issue, and the length of time those indicia of commercial awareness have been evident, widespread critical assessments and notice by independent sources of the products identified by the marks, as well as the general reputation of the products and services. *Bose Corp. v. QSC Audio Prods. Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305-06, 1309 (Fed. Cir. 2002).

The record establishes that the mark MCDONALD'S is famous for purposes of likelihood of confusion. As noted above, Opposer has used the MCDONALD'S mark in connection with food and restaurant services since 1955,[12] and today operates 14,000 restaurants in the United States which serve 26 million people per day.[13] In addition, Opposer has widely advertised under the MCDONALD'S mark for several decades. Opposer uses "vehicles" such as "television, radio, digital, out-of-home, which is billboards, print, both in magazine and newspaper, as well as point-of-purchase materials at the restaurant." Sterling Test., 62:14-18.

As Mr. Sterling testified, Opposer's "television advertising strategy" is:

> "to try to be in the highest rated shows, the most engaging programing, the most relevant programming.

---

[12] Sterling Test., 6:12-21.

[13] *Id. at* 7:1-12.

> We buy – literally we buy across all four networks, ABC, NBC, CBS, Fox and the top program on all these programs ....  We literally buy every program across the networks and then we buy about 20 deep on the cable.  So, we buy all the top cable channels, Turner and MTV Networks and ESPN and various – USA and Lifetime, A & E, the History Channel, Animal Planet, Discovery."

Sterling Test., 119:9 – 120:2.

"The main components of [Opposer's] digital advertising is [sic] display banners, sponsorship, site sponsorships, mobile, social media like Facebook and Twitter and other, Google Plus, and video advertising on-line."  *Id*. at 165:8-12.  Opposer uses both static display banner ads and rich media ads (which have moving images and pop-ups), which they place on websites, such as Google Ad Network, Yahoo!, MTV Networks, NFL, ESPN, Hulu, YouTube, and Vivo.  *Id*. at 165:16 – 166:15.   Online display ads are audited using Comscore, which measures the delivery of the ad unit and whether or not the ad unit was clicked on.  *Id.* at 170:23-171:142.   For example, in March 2008, the Comscore audit indicated that Opposer had "295 million ad displays" and the number of "unique visitors was 51 million people."  *Id.* at 174:10-14.

Opposer sponsors a number of sporting events, e.g., McDonald's LPGA championship,[14] the Olympics,[15] and NASCAR,[16] and buys advertising in connection with sporting events that are televised.[17]

---

[14] *Id*. at 167:22 – 168:5 (Sponsorship lasted for 20 years and was aired on the Golf Channel).

[15] *Id*. at 209:9-10 ("We are an Olympic sponsor.").

[16] *Id*. at 121:7-10 – ("We buy a ton of NASCAR and we support a race team.  We are the primary sponsor on about 16 races a year and our driver last year won both the Daytona 500 and the Brickyard 400.").

15

The record also shows that Opposer's family of marks is famous for purposes of likelihood of confusion. Opposer started its family of marks in 1973, when it adopted the mark EGG MCMUFFIN. Since then Opposer has used the "MC" prefix to "describe various McDonald's products … as well as discussing their relationship to McDonald's." Sterling Test., 10:23 – 11:6. The "MC" family of marks is integrally associated with the MCDONALD'S mark and its goods and services. Opposer has put years of work "into developing the Mc marks, [and] the Mc family of trademarks." O'Malley Test., 14:1-3. Based on "the extensive resources and advertising budgets they put behind it, we believe there is an immediate association between Mc formative marks and McDonald's. And we continue to leverage that in order to market new products and give consumers immediate information about the product that it's associated with us and the attributes that we believe that conveys to consumers." *Id.* at 14:3-11.

Opposer has made of record evidence that it annually sells an enormous number of products under each of its "MC" family members.[18] Further, at any given time, Opposer extensively advertises products within the "MC" family of marks.[19] Along with advertising the products sold under the "MC" family, some of Opposer's

---

[17] *Id.* at 120:21-24 ("We buy the NCAAs. We buy the NBA, NFL, NHL, US soccer, World Cup, Olympics. …There is not a sporting event out there we don't buy.").

[18] The number of each product sold annually was provided in the confidential portion of the Sterling Test. Because the information is confidential, we will not include specifics in this decision.

[19] The annual advertising expenditures for "MC" prefix marks were provided in the confidential portion of the Sterling Test. Because the information is confidential, we will not include specifics in this decision.

advertisements also stress the "MC" prefix, which is the foundation of the family. For example:

- In 1974, Opposer ran a national television commercial to promote its fictional "McLanguage":

  Ready, gang?

  Ready, Ronald.

  Ah-one, ah-two.

  [Singing] McDonald's makes McBurgers,
  McDonald's makes McFries,
  McDonald's makes McWonderful shakes,
  For kids of every size.
  However, they do, whatever they do,
  They're different from all the rest.
  So, let's go to McDonalds.  It's the place we love McBest.

  What kind of talk is that, Ronald?

  Why, that's the Hamburgers' McLanguage.  Do you want
  to learn it?

  Sure.

  It's easy, just follow the bouncing hamburger.

  [Repeat song].

  *See* O'Malley Test., 18:17 - 19:11 (McD11622);

- In 1981, ran another McLanguage ad:

  Presenting Ronald McDonald and Rockin' McLanguage.

  Mc1, 2, 3, 4.

  (Singing) There's nothing McTo it. You can McDo it.

  Just pick a word.  Add a Mc to it.  Yeah.

17

> McYou, McMe, McCamera, McWe.
>
> It's Rockin' McLanguage.
>
> There's so much fun for you today at McDonald's.

*See* O'Malley Test., 23:19 – 24:16. (McD9071);

- In or around 1995 and 1996, Opposer ran the following ad in several newspapers across the United States:



The text in the ad reads, in part: "Without it, we'd just be Donald's. --- Imagine a McNugget without the Mc. Take MC away from Mc Chicken and all you have is a chicken sandwich. McLean would still be lean, sure, but as much fun? No. And Ronald McDonald without it would be, well a different clown altogether."

*See* O'Malley Test., 27:16-18 and Exhibit 73; and

- In 2004, Opposer ran the following print ad that was added to the McDonald's website (www.McDonalds.com) in digital form in 2011:



The text in the ad reads, in part:

"What does Mc' mean to me?  Everything that I love.  It's a big part of my favorite foods like Chicken McNuggets' or an Egg McMuffin sandwich.  Mc is a good time because it always brings us together.  It reminds me of something delicious and dependable.  To me, Mc means McDonald's: So I'm cool with Mc and Mc is cool with me."

*See* O'Malley Test., 30:8 – 31:16 and Exhibit 74.

In the United States, Opposer "spend[s] millions and millions and millions of dollars every year to promote the McDonald's brand and all of [its] products, which include a wide variety of MC products and [its] restaurant services."  O'Malley

Test., 10:15-23. It is common for Opposer and its local franchises to advertise multiple "MC" prefix marks in the same ad. Sterling Test., 144:13-145:10. Examples include:

> National ads for Opposer's breakfast menu, which include the marks SAUSAGE MCMUFFIN, EGG MCMUFFIN, MCGRIDDLES, and MCCAFE (*Id.* at 69:12-21);
>
> MCCHICKEN and MCDOUBLE sandwiches are advertised together in advertisements for Opposer's Dollar Menu (*Id.* at 144:1-12); and
>
> Local ads include offers to mix and match sandwiches for a specific price, i.e., MCMUFFIN and MCGRIDDLE – 2 for $3. (*Id.* at 145:2-9).

In addition to television, print and digital advertising, Opposer advertises its "MC" family of marks in its restaurants. According to Mr. Sterling:

> [T]he reason I keep talking about in restaurant, by the way, [sic] just to remind you, 26 million people come to McDonald's every day.
>
> It's important for us to make sure that we're merchandising all these things in our restaurant because the number of exposures or impressions that we are generating [at] the restaurant level is as impactful as any of our other media …

*Id.* at 108:9-24.

Every in-store and drive-thru advertisement is displayed in all 14,000 stores. The advertisements and promotional material include: window decals, signs and banners, pole signs, pre-sell translites, drive-thru menu board translites, food photography, tray toppers, register toppers, in-store translites and menu boards and crew posters. *See id.* at 151:22-152:3, 109:10-110:1.

20

Opposer's use of the "MC" prefix as the common characteristic of its family, along with the extensive advertising and promotion of the "MC" prefix marks together in advertisements and in Opposer's restaurants, and the extensive number of products sold under the "MC" family of marks establish that the "MC" family is famous for the purpose of likelihood of confusion.

Relying on *Citigroup Inc. v. Capital City Bank Group Inc.,* 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011), *B.V.D. Licensing Corp. v. Body Action Design, Inc.,* 846 F.2d 727, 6 USPQ2d 1719 (Fed. Cir. 1988) and *Jim Beam Brands Co. v. Beamish & Crawford, Ltd.,* 852 F. Supp. 196, 31 USPQ2d 1518 (S.D.N.Y. 1994), Applicant argues that "the fame of [Opposer's] mark may weigh against a finding of likelihood of confusion because consumers are so familiar with the famous mark that they can readily identify differences with other marks and the goods or services offered thereunder." Applicant's Brief, p. 32. Applicant's reliance on these cases is misplaced. Neither of the two courts that issued these decisions found that consumers can more easily distinguish famous marks from other marks. Thus, these cases do not stand for the proposition suggested by Applicant. Further, with respect to *B.V.D. Licensing Corp. v. Body Action Design,* the Federal Circuit has stated that "[t]he holding of *B.V.D.,* to the extent it treats fame as a liability, is confined to the facts of that case." *Kenner Parker Toys Inc. v. Rose Art Indus. Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1457 (Fed. Cir. 1992). Moreover, "both before and after *B.V.D.,* this court has consistently afforded strong marks a wider latitude of legal protection than weak marks." *Id.*

Accordingly, we find, for the purpose of our likelihood of confusion analysis, that the mark MCDONALD'S and Opposer's "MC" family of marks are famous, as used in connection with restaurant services and food products, and that they are entitled to a wide latitude of legal protection.

**Is Applicant's mark similar to Opposer's family of "MC" marks?**

Turning to the *du Pont* factor of the similarities and dissimilarities of the marks, in comparing Opposer's "MC" formative marks with Applicant's mark, the question is not whether Applicant's mark is similar to Opposer's individual marks, but whether Applicant's mark would likely be viewed as a member of Opposer's family of marks. *Black & Decker Corp. v. Emerson Elec. Co.*, 84 USPQ2d 1482, 1491 (TTAB 2007); *Plus Prods. v. Med. Modalities Assocs., Inc.,* 217 USPQ 464, 465 n.8 (TTAB 1983) ("purchasers familiar with plaintiff's family of marks would believe the defendant's mark is but another member of that family."). As discussed above, Opposer's family of marks consists of the "MC" formative followed by a descriptive or generic term for a food product to identify Opposer's restaurant services or products.

The pattern that Applicant's mark follows, i.e., the prefix "MC" followed by a term that describes a characteristic of the products, is the same pattern that is used by Opposer's family of marks. We also note that Opposer's "sweet tea" has been referred to by the public as "McSweet Tea." *See,* for example, the following statements included in Opposer's 3rd NOR:

> (1) "Seriously at McDonalds it's called 'McSweet Tea'!!
> It's soooo yummy and chocked full of sugar …" (posted on
> July 12, 2007 on *The Crazy Pink House* under

22

"Ahhhhhhh, sweet tea!" www.crazypinkhouse.blgspot.com – L-145);

(2) "…we headed out to McDonald's to get some McSweet Tea." (posted on *The Asian Cowboy* www.the asiancowboy.tumblr.com – L146); and

(3) "…so I grab a McDonalds dollar hamburger … and their latest wonderful invention, the one dollar McTea or McSweet Tea or something like that …" (posted on July 14, 2009 on*Washingtonpost*.com All We Can Eat – Will the Recession Make Us Healthy? – L-152).

Applicant's claim that its mark would not be considered a member of Opposer's family of marks is not persuasive. While acknowledging that its mark was created by Leo McIntyre using the "MC" from his surname and the term "SWEET" to describe the sweet brine used to pickle onions,[20] Applicant argues that its mark can be distinguished from Opposer's family of marks because it is a surname. In support of its contention, Applicant submits fewer than 30 listings for living people in the United States with the surname "McSweet," approximately 20 deceased people, most of whom died in the late 19th or early 20th century and two fictional characters.[21] These listings establish that McSweet is, at best, a very rare surname. Further, the non-surname significance of "McSweet" is acknowledged by Applicant, who states: "Because McSweet is not Applicant's surname or the surname of anyone in Applicant, and the designation is relatively rare, MCSWEET should not be deemed primarily merely a surname ...." Applicant's Brief, p.22, fn10.

---

[20] McCaslin Depo., 187:16-19 (Mr. McCaslin testified that his understanding about how McIntrye selected the MCSWEET mark is: "he took the M-C from his own surname, McIntyre, and combined it with the 'sweet' of the sweet brine that he had created in the onion product to make his brand name 'MCSWEET'.").

[21] *See* Applicant's 2nd NOR Exhibits D-36, D-42, D-44, D-49, D-54 and L-317-L-463.

We find that the public will likely view Applicant's mark as a member of Opposer's family of "MC" marks, rather than as a surname.

Applicant argues that, in our analysis of the similarity or dissimilarity of the marks, we should consider the differences in the parties' trade dress because trade dress is relevant to establish commercial impression and that "Applicant's trade dress is strikingly different from that of Opposer …." Appeal Brief, p. 23. Our finding is not affected by the differences in the trade dress used by the parties. To that end, we note that the marks at issue are all word marks. *See, e.g., Kimberly-Clark Corp. v. H. Douglas Enters., Ltd.*, 774 F.2d 1144, 1147, 227 USPQ 541, 543 (Fed. Cir. 1985) ("It is settled, however, that a distinction in trade dress cannot weigh against likelihood of confusion with respect to the registration of a simple word mark . . . . The reason is that such dress might well be changed at any time; only the word mark itself is to be registered.")

Because Applicant's mark and Opposer's family of marks all start with the prefix "MC" and are followed by a term that is descriptive or generic for the goods, we find that the similarities in appearance, meaning and commercial impression between Applicant's mark MCSWEET and Opposer's family of "MC" formative marks are such that potential consumers would view Applicant's mark as a member of Opposer's family of marks.

### Are Applicant's goods related to Opposer's goods and services?

We next consider the similarity or dissimilarity between the goods and services. Our evaluation of the goods and services is based on the goods and

24

services as identified in the registration(s) and application(s). *Stone Lion Capital Partners, LP v. Lion Capital LLP,* 76 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *Octocom Sys., Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Canadian Imperial Bank v. Wells Fargo Bank, N.A.*, 811 F.2d 1490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987).

The goods need not be identical or even competitive to support a finding of likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000). The respective goods need only be "related in some manner and/or the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that [the goods] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1722 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)).

Opposer has made of record registrations for the following marks that are members of its family of "MC" marks for the following goods and services:

| Goods and Services | Marks |
|---|---|
| restaurant services | MCNUGGETS |
| cooked chicken for consumption on or off the premises | MC CHICKEN |
| sandwiches for consumption on or off the premises | MC DOUBLE |
| sandwiches for consumption on or off the premises | MCRIB |
| breakfast food combination | MCMUFFIN |

25

| sandwich for consumption on or off the premises | |
| --- | --- |
| hot cakes | MCGRIDDLES |
| breakfast entrees consisting of eggs, meat, cheese and vegetables | MCSKILLET |
| beverages made of coffee beans, hot chocolate, pastries, muffins, cakes, cookies, biscuits and sandwiches | MCCAFE |

Further, Opposer has proffered evidence of extensive use of its "MC" family of marks, including MCDOUBLE sandwiches. (Sterling Test., 99:10-11); MCCHICKEN sandwiches (*id.* at 101:2-3); MCNUGGET chicken pieces (*id.* at 107:6); and MCRIB sandwiches (*id.* at 113:23).

Applicant's goods, as identified in its applications, are: pickled gourmet vegetables, namely, pickled cocktail onions, pickled garlic, pickled and marinated olive medley; and pickled asparagus. Pickled vegetables are offered at quick service restaurants, which is the category of Opposer's restaurants. Opposer offers multiple products that contain pickles and onions. *Id.* at 313:15-17. Ms. O'Malley testified to her knowledge that the Potbelly sandwich chain sells jarred, packaged giardiniera in its restaurant, where they also offer pickled vegetables for sandwich toppings. *See* O'Malley Test., 146:9-17. Further, in its third notice of reliance Opposer proffered evidence of the use of pickled vegetables by "quick service restaurants" in connection with their sandwiches. Examples include Domino's,

which offers oven baked sandwiches that include various vegetables, i.e. banana peppers and jalapenos – www.dominos.com (NOR p. L-113); Quiznos, which uses the advertising slogan, "Make your sub sandwich your own. Spice it up with our Pepper Bar." – www.quiznos.com (NOR p. L-114); and Jimmy John's, which offers a "pickle bucket." – www.jimmyjohns.com (NOR p. L-115).

The evidence establishes that Applicant's identified pickled vegetables can be used as toppings in connection with sandwiches. Given the fame of Opposer's "MC" family of marks for its food products and the complementary nature of the goods, we find the parties' goods to be sufficiently related to support a finding of likelihood of confusion. *See Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); *General Mills Inc. v. Fage Dairy Processing Indus. SA,* 100 USPQ2d 1584, 1597 (TTAB 2011).

### In what channels of trade do Applicant's goods and Opposer's goods and services travel?

Applicant attempts to distinguish its goods from Opposer's by arguing that its goods travel in different channels of trade from Opposer's goods and services, arguing that its goods are not sold in quick-service restaurants. We do not find this argument persuasive since the identifications of goods in the opposed applications do not restrict the channels of trade. As set forth in *CBS, Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 199 (Fed. Cir. 1983),

> Where likelihood of confusion is asserted by an [O]pposer
> with respect to a trademark for which an application for
> registration has been filed, the issue must be resolved on
> the basis of not only a comparison of the involved marks,

27

> but also on consideration of the goods named in the application and in [O]pposer's registration and, in the absence of specific limitations in the application and registration, on consideration of the normal and usual channels of trade and methods of distribution. The description of the goods in the application for registration is critical because any registration that issues will carry that description.

The ordinary channels of trade for Applicant's goods as identified include grocery stores. Opposer has established that the normal channels of trade for the type of food it sells overlap with the normal channels of trade in which Applicant's goods are sold. Mr. McCaslin testified that McSweet's pickled vegetables are sold in grocery stores. McCaslin Test., 117:19-23 ("We sell in grocery stores…"). Restaurant-branded foods are also sold in supermarkets or grocery stores. For example Burger King frozen onion rings, White Castle frozen hamburgers, and T.G.I. Friday's frozen appetizers are all sold in supermarkets. O'Malley Test., 21:13 – 137:23. Thus, grocery stores are within the ordinary channel of trade for restaurant-branded goods. The fact that Opposer is not currently selling its food products in grocery stores does not obviate the overlap in the ordinary channels of trade where its registrations are not limited so as to exclude this channel. Moreover, as discussed, *supra,* pickled vegetables are offered at quick service restaurants, which is the category of Opposer's restaurants.

Finally, since 1993, Opposer has operated McDonald's restaurants inside of Walmart stores. Oakland Test., 6:3-9. Walmart sells groceries in its stores. *Id.* at 10:20 – 11:16. Accordingly, we find that this factor also weighs in favor of finding that confusion is likely.

**Are the purchasers of Applicant's goods sophisticated customers?**

While acknowledging that "[a]s food products, Applicant's products are low-priced relative to big-ticket items such as cars,"[22] Applicant argues that its products are "gourmet" and "not low-priced for gourmet pickled vegetables," that "the grocery category [for its products is] top-shelf gourmet" and its channels of distribution attract purchasers who "are likely to be more discriminating." Although Applicant's identifications of goods describe the goods (other than the asparagus) as "gourmet,"[23] Applicant has not submitted evidence that its pickled "gourmet" vegetables are different from other pickled vegetables, nor has Applicant submitted evidence that its goods are more expensive than other pickled vegetables. To the contrary, Applicant has submitted evidence that its pickled vegetables sell for less than other pickled vegetables. A photograph taken by Applicant at a QFC supermarket shows tags on the shelf revealing that the unit price for a 16 ounce jar of Applicant's "pickled cocktail onions" ($10.98 per pound) is lower than the unit price for a 16 ounce jar of SABLE & ROSENFELD "tipsy onions" ($15.06 per pound) and for an 8 ounce jar of MEZZETTA "imported cocktail onions" ($11.56 per pound). McCaslin Depo., Exhibit 41. Further, as evidenced by the following Thriftway supermarket flyer dated June 14, 2012,[24] Applicant's products are advertised in store fliers with other grocery items that are not promoted as gourmet products,

---

[22] Applicant's Brief, p. 31.

[23] Applicant offers no evidence regarding the difference between "pickled gourmet vegetables" and "pickled vegetables."

[24] Opposer's Notice of Reliance, Exhibit N 174-175.

e.g., Pepsi Products, Tazo Teas, Darigold Milk, Dryer's Ice Cream, San Marzano Tomatoes, Wheat Thins crackers, and Chips Ahoy cookies.



In any event, we cannot resort to extrinsic evidence to restrict the classes of consumers and, as a result, ascribe to that subset of consumers a higher level of sophistication than we otherwise would. *See, e.g., Canadian Imperial Bank*, 1 USPQ2d at 1814-15; *see also In re Bercut-Vandervoort & Co.,* 229 USPQ 763, 764 (TTAB 1986) (evidence that relevant goods are expensive wines sold to discriminating purchasers must be disregarded given the absence of any such restrictions in the application or registration). Moreover, there is no evidence

supporting Applicant's allegations that its products are not impulse buys but rather "extras," and that "purchasers are likely to give such items more consideration before purchasing."[25]  To the contrary, we find that Applicant's goods are relatively low-priced items.  In response to Opposer's interrogatory number 8, Applicant provided the prices for each of its products, which range from $4.99 -$10.99.[26]  Such goods may be subject to impulse buying.  "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc. v. M.C. Becton*, 54 USPQ2d at 1899. Accordingly, we find that this factor also weighs in favor of finding that confusion is likely.

### To what extent are there third-party uses of similar marks in connection with similar goods?

Applicant submitted evidence of third-party marks which include the prefix, "MC."  The evidence included the testimony, either by deposition or affidavit of the principals of McIlhenny Company (which sells Tabasco hot pepper sauce and owns registrations that include the word McIlhenny),[27] Specialty Brands of America (which sells McDonald's maple syrup),[28] Sturm Foods (which sells McCann's oatmeal and is the owner of a registration for that mark),[29] McCain Foods USA

---

[25] Applicant's Brief, pp. 31-32.

[26] Opposer's First Notice of Reliance, pp. 3-4.

[27] Paul McIlhenny, Chairman of the Board and Chief Executive Officer of McIlhenny Company.

[28] Walter McKenna, Controller of Specialty Brands of America.

[29] Mark Fields, Senior Category Manager and Business Development Manager of Sturm Foods.

(which sells McCain frozen potatoes and is the owner of registrations for said mark),[30] and B&G Foods, Inc. (which sells Molly McButter seasonings and owns registrations for said mark).[31] Applicant also submitted evidence of other uses and registrations of marks having an "MC" prefix for other food and beverage products. Applicant's evidence of third-party uses does not diminish the strength of Opposer's "MC" family of marks. Unlike Applicant's mark, the MC-formative elements of the third-party marks (with the exception of the element MCBUTTER) do not share the structure of Opposer's "MC" family of marks since they do not consist of the prefix, "MC" and a suffix consisting of a generic or descriptive term. The majority of these marks consist of or contain surnames (e.g., McCormick, McCann's, McCain, McIlhenny, McKinley, and McAdams). We therefore do not find this factor to weigh in Applicant's favor.

### What is the extent to which Applicant has a right to exclude others from using the MCSWEET mark on goods?

"The extent to which applicant has a right to exclude others from use of its mark on its goods" is listed as the eleventh factor in the *du Pont* decision. 177 USPQ at 567. Quoting Jeffrey A. Handelman, GUIDE TO TTAB PRACTICE § 6.15 (2012), Applicant argues that "if the applicant has made a significant investment in developing valuable goodwill in the mark, used the mark for a lengthy period of time without experiencing any actual confusion with the marks of others, and achieved commercial success and valuable consumer recognition in the mark, these

---

[30] Thomas Czoschke, Senior Brand Manager for U.S. Retail Potatoes, of McCain Foods USA.

[31] Vanessa Maskal, Executive Vice President of Sales and Marketing for B&G Foods, Inc.

factors tip the equities in applicant's favor and support granting the requested registration."[32]   However, the mere assertion of common-law use does not in itself suffice to establish the extent to which an applicant has a right to exclude others from use of the mark. *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1205 (TTAB 2009) (the mere assertion of common-law use of its mark for ten years is not sufficient). The record is not clear about when Applicant first used the MCSWEET mark. Applicant alleges that its predecessor commenced use of its mark on cocktail onions in 1990 and that Applicant started distributing cocktail onions for its predecessor in 1999. McCaslin Test., 21:12-21. However the only evidence supporting the assertion of use in 1990 consists of two unauthenticated documents that Applicant alleges are a Marriott Corporation newsletter stating that "McSweet cocktail onions had been okayed for purchase by all beverage managers in their establishment" and a St. Patrick's Day 1990 flier that his predecessor "created for an Irish pub in Burien that they had a big, kind of a launch party there for the McSweet cocktail onions …." *Id.* at 15:11-24.  There is no evidence of actual sales until 2007, which are included in the sales and advertising figures that Applicant provided for the years 2007 – 2011.   However, Applicant's sales figures and Applicant's advertising and promotional expenditures are not sufficient to establish an appreciable level of consumer recognition. Importantly, there is no evidence that Applicant, in fact, has successfully asserted its rights so as to "exclude" anyone else

---

[32] Applicant's Brief, p. 44.  We view this argument as raising both the eleventh *du Pont* factor and the eighth *du Pont* factor ("The length of time during and conditions under which there has been concurrent use without evidence of actual confusion.").  We discuss the eighth *du Pont* factor in the following section.

from using MCSWEET or any similar mark. Accordingly, we treat this factor as neutral.

### Is the absence of evidence of actual confusion determinative in this case?

Finally, Applicant alleges that "in the more than 20 years since the first use of the MCSWEET mark, there has not been a single instance of actual confusion between the MCSWEET mark and Opposer's pleaded marks." Applicant's Brief, p. 43. Applicant relies on the testimony of its principal James McCaslin and on Opposer's responses to interrogatories, wherein Opposer asserts that it has no knowledge of instances of actual confusion. Mr. McCaslin testified that he was not aware of any confusion that his customers may have had between his company, and Opposer[33] and that he never received any communication from anyone connecting him or his products with Opposer.[34] However, as noted *supra,* while Applicant alleged more than 20 years of use, it provided no evidence of use or advertising prior to 2007. Moreover, Applicant testified that it first sold pickled cocktail onions in 1999,[35] it first sold garlic and olives in 2006,[36] and it first sold asparagus in 2008.[37] Thus, prior to 2006 all of Applicant's alleged sales of pickled vegetables were limited to pickled cocktail onions. The sales and advertising figures Applicant did provide were not substantial. Further, the actual channels of distribution of the pickled

---

[33] McCaslin Test., 149:9-13.

[34] *Id.* at 149:14-20.

[35] *Id.* at 113:18-22.

[36] *Id.* at 109:10-15, 110:15-19.

[37] *Id.* at 111:20-22.

onions were limited "to hotel and restaurant bars as well as supermarkets [] in the Seattle area"[38] and to the Internet. By contrast, the actual channels of trade for Opposer during this time period were limited to its quick-serve restaurants. In short there is scant evidence in the record upon which to determine whether there has been a meaningful opportunity for confusion to occur. The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by Applicant of its mark for a significant period of time in the same markets as those served by Opposer under its marks. *Citigroup Inc. v. Capital City Bank Group, Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010) aff'd, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011). Accordingly, this factor does not weigh in applicant's favor.

**Conclusion.**

Having considered all the evidence[39] and argument on the relevant *du Pont* factors, whether specifically discussed herein or not, we conclude that Applicant's use of the mark MCSWEET in connection with pickled gourmet vegetables is likely to cause confusion with Opposer's "MC" family of marks for its restaurants and food products.

---

[38] *Id.* at 13:5-7.

[39] We further note that Opposer submitted a likelihood of confusion survey based on the "Eveready" format that also supports likelihood of confusion. *See Starbucks U.S. Brands LLC v. Ruben*, 78 USPQ2d 1741, 1753 (TTAB 2006) (citing *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 188 USPQ 623 (7th Cir. 1976)). Given the other evidence of record, we need not rely on that survey for our determination on likelihood of confusion. However, we discuss the companion dilution survey *infra*.

**Dilution.**

Next, we consider Opposer's claim that Applicant's mark will dilute its famous "MC" family of marks by blurring the distinctiveness of the family characteristic of these marks.[40] "Dilution by blurring is [the] association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." Section 43(c)(2)(B) of the Act, 15 U.S.C. § 1125(c)(2)(B). "Dilution diminishes the 'selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.'" *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1182 (TTAB 2001) (internal citation omitted).

"[T]o prevail on a dilution claim ..., a plaintiff must show that: (1) it owns a famous mark that is distinctive; (2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark; (3) the defendant's use of its mark began after the plaintiff's mark became famous; and (4) the defendant's use of its mark is likely to cause dilution by blurring ...." *Coach Servs. Inc.* 101 USPQ2d at 1723-24. In this case, we must determine whether, for dilution purposes, the terminology "famous mark" in Section 43(c)(2)(B) is applicable to a "famous family of marks." We hold that this language in the statute encompasses not just an individual famous mark, but also a famous family of marks. There is nothing in the Lanham Act or its legislative history to warrant the exclusion of a family of marks

---

[40] As with our likelihood of confusion analysis, we restrict our determination of the dilution claim to consideration of Opposer's "MC" family of marks. Further, we agree with Applicant that Opposer waived the claim of dilution by tarnishment. Accordingly, we restrict our discussion to the claim of dilution by blurring.

36

from protection against dilution. Indeed, the inherent nature of a family of marks, may make such marks more susceptible to blurring than a single mark. We also observe that courts in both the Second and Seventh Circuits have recognized that the dilution provisions of the Lanham Act are applicable to a family of marks. *See AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d. 796, 65 USPQ2d 1001, 1015 (7th Cir. 2002) ("DaimlerChrysler's dilution claim requires proof that the family of marks existed before General Motors adopted the allegedly diluting mark."); *Citigroup Inc. v. City Holding Co.,* 171 F. Supp. 2d. 333 (S.D.N.Y. 2001) ("[T]here is no question that the CITI family of marks is famous within the meaning of the [Federal Trademark Dilution Act].").

### Is Opposer's "MC" family of marks distinctive and famous?

For dilution purposes, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." Section 43(c)(2)(A) of the Act, 15 U.S.C. § 1125(c)(2)(A).[41] To determine whether the "MC" family of marks is widely recognized by the general consuming public of the United States as a designation of source of Opposer's goods or services, we consider the following: (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and

[41] By its terms, this appears to be a higher standard than the standard set forth in *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En1772,* 73 USPQ2d at 1694, which is used to determine fame for purposes of likelihood of confusion (holding that fame "arises as long as a significant portion of the relevant consuming public … recognizes the mark as a source indicator.").

geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; and (iv) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the Principal Register. *See id.*

Taking into account the non-exhaustive factors enumerated above as well as other considerations, we find that Opposer has established that its family of "MC" marks is famous for dilution purposes.

As discussed above, Opposer's family of marks was derived by taking the prefix of its famous mark MCDONALD'S and combining it with a descriptive or generic term. The record establishes that the purchasing public recognizes that the common characteristic of these marks, the prefix "MC," is derived from Opposer's house mark MCDONALD'S and is associated with Opposer. As discussed below, the marks are used side-by-side at the point of sale, both on menu boards and in advertisements, which exposes the public to the products and reinforces the association between the "MC" family of marks and Opposer.

Springing off of the fame of the MCDONALD'S mark, Opposer's "MC" family of marks has developed into a famous family of marks in its own right. Initially, we note that it is not in dispute that Opposer's "MC" family of marks is inherently distinctive and the record supports such a finding. *See also J & J Snack Foods Corp. v. McDonald's Corp.*, 18 USPQ2d at 1892 (members of the family consisting of marks composed of the prefix "MC" with a descriptive term are also fanciful marks). Accordingly, the family of marks meets the statutory requirement that the famous

mark or, in this case, the famous family of marks, be distinctive. Opposer has established continuous use of its "MC" formative marks, starting with the adoption of EGG MCMUFFIN in 1973. *See* Sterling Test., 10:19-24. As discussed, *supra,* Opposer has been promoting its family of marks since 1974, when it ran a national television commercial advertising the McDonald's "Mc" formative family of marks by introducing the public to "McLanguage." *See* O'Malley Test., 18:17 - 19:11. Promotion of the "McLanguage" was also prominent in a 1981 commercial entitled "Presenting Ronald McDonald and Rockin' McLanguage." *Id.* at 23:19 – 24:16. Print advertisements stressing the "MC" element of the marks were disseminated in both the mid-1990s and in 2004. *Id.* at 27:16-18 and 17:5-8.

The eight registrations on which Opposer bases its claim of dilution are all registered on the Principal Register. Its first registration for a "MC" formative mark (MC CHICKEN) was obtained in 1977,[42] and among the early registrations for "MC" formative marks are the following registrations of record, which are still subsisting: Reg. No. 1266500 for the mark MC DOUBLE, which registered on February 7, 1984; Reg. No.1315979 for the mark MCRIB, which registered on January 22, 1985; and Reg. No. 1369360 for the mark MCMUFFIN, which registered on November 5, 1985.[43]

---

[42] Reg. No. 1065885 for the mark MC CHICKEN registered on May 17, 1977.

[43] Opposer also asserted a number of registrations obtained before 1990 that are no longer subsisting, including: Reg. No. 1118362 for MCPIZZA, registered May 15, 1979; Reg. No. 1485636 for MCD.L.T., registered April 19, 1988; Reg. No 1566184 for MCCOOKIE, registered November 14, 1989; Reg. No. 1541797 for MCCOLA, registered May 30, 1989; Reg. No. 1453377 for MCBAGEL, registered August 18, 1987; and Reg. No. 1552143 for MCCHILI, registered August 15, 1989.

In 1986, Opposer operated over 7,000 restaurants in the United States.[44] The number of restaurants operated in the United States increased annually.[45] As discussed *supra,* Opposer currently operates over 14,000 restaurants across the United States that collectively serve an average of 26 million people every day.[46] Opposer promotes its family of marks in connection with its restaurants. Outside of the restaurants there are window decals, store signage, banners on top of the stores and pole signs that display its "MC" family of marks individually and together. There is a drive-thru, within which there is a menu board with translites (advertisements printed on plastic or petroleum-based materials that are placed on menu boards and backlit for easy reading) that display various members of the "MC" family of marks.[47] *Id.* at 109:14 – 110:1-2. Inside the restaurants Opposer advertises products under the "MC" family of marks using tray toppers (which go on garbage receptacles where the trays are returned), register toppers (advertisements on top of the cash registers), and menu boards with translites. *Id.* at 110:3-7. At any given time, Opposer extensively advertises one or more products within the "MC" family of marks in places other than the restaurants.[48] With respect to advertising in the United States, Ms. O'Malley testified, "we spend … millions of

---

[44] 1996 Annual Report - Exhibit 34 to Sterling Test., McD007806.

[45] *Id.* (Number of restaurants owned in the United States for each year from 1986 through 1996 and annual reports for 1997 – 2010, which report the number of restaurants owned in the United States for the year of the report and the two preceding years.)

[46] *See* Sterling Test., 7:1- 12.

[47] *See* Sterling Test., 98:16-21.

[48] The annual advertising expenditures for "MC" prefix marks were provided in the confidential portion of the Sterling Test. Because the information is confidential, we will not include specifics in this decision.

dollars every year to promote the McDonald's brand and all of our products, which include a wide variety of MC products and our restaurant services." O'Malley Test., 10:15-23. As evidenced by Mr. Sterling's testimony, Opposer advertises multiple "MC" family products in the same advertisements.

> "[The] Dollar Menu has two 'Mc' products that are in them, both McChicken and Mc Double. Since they are the two lead proteins that we offer, they would be in our advertising."
>
> But we would also advertise – I will give you a great example at breakfast. So we advertise Egg McMuffin and Sausage McMuffin with Egg all the time because they're supporting sandwiches.
>
> We do – locally they do mix and match. So they will have a McMuffin and a McGriddle in their advertising, so you can buy one, mix and match 2 for $3, 2 for $3.33. There is a variety of tactics.
>
> But the use of a combination of products is something that we do on a regular basis and, frankly, "Mc" products go along with that.

Sterling Test., 144:13-145:10. *See Black & Decker,* 84 USPQ2d at 1490-91 (family of marks found when family members are jointly advertised.)

The evidence shows that Opposer sells an extraordinarily impressive number of products identified by individual marks in the "MC" family. As discussed *supra,* Opposer made of record confidential information regarding the unit sales of MCDOUBLE sandwiches (Sterling Test., 99:10-11), MCCHICKEN sandwiches (*id.*

at 101:1-3), MCNUGGET chicken pieces (*id.* at 107:6), MCRIB sandwiches (*id.* at 113:23), and MCCAFE beverages (*id.* at 92:9-16).[49]

Based on the record, we find that Opposer's "MC" family of marks is famous for the purpose of establishing dilution.

### Is Applicant using a mark in commerce that allegedly dilutes Opposer's famous family of marks?

Opposer, as plaintiff in this proceeding, must also prove that Applicant is using a mark in commerce that allegedly dilutes Opposer's famous family of marks. Opposer proffered evidence of Applicant's use of the mark MCSWEET, which it obtained through various sources, including a Rule 30(b)(6) deposition of Applicant on March 26, 2009.[50] Applicant testified that "McSweet, LLC is in the business [of] production and distribution of gourmet pickled vegetables." McCaslin Depo., 57:23-24. Applicant verified that McSweet, LLC sells "pickled cocktail onions, pickled garlic, gourmet olive bliss, pickled giardiniera and pickled asparagus under the McSweet mark." *See id.* at 58:13-25. The evidence is sufficient to establish that Applicant is using a mark in commerce that allegedly dilutes Opposer's famous family of marks. Moreover, the filing date of Applicant's application constitutes

---

[49] The numbers of products sold were annual figures. While Mr. Sterling indicated that the figures were accurate for a period of years, there was no testimony regarding the exact period to which they applied. To provide the general context of the magnitude of sales for all of its products over the years, including those sold under the MC family of marks, Opposer's total revenues from sales in the United States have steadily risen from $2,424,910,000 in 1984 to $8,112,000,000 in 2010. Total revenues consist of "sales that [Mc Donald's] generate[s] at restaurants that [Mc Donald's] owns and [ ] the margins [Mc Donald's] receive[s] or revenue [Mc Donald's] receives from [its] franchisees." Sterling Test. 23:3-6.

[49] Exhibit 38 (McD010456) and Exhibit 20 (McD011509) to Sterling Test.

[50] James McCaslin was Applicant's 30(b)(6) designee.

constructive use, which is sufficient to meet this prong of the test. *Chanel, Inc. v. Makarczyk*, 110 USPQ2d 2013, 2023 (TTAB 2014).

### Did Applicant's use of the mark MCSWEET begin after Opposer's family of "MC" marks became famous?

We find that Opposer has established sufficient fame dating back to at least as early as 1986 to support a claim of dilution.[51] Therefore, even if we assume that Applicant established 1990 as its date of first use,[52] the record establishes the fame of Opposer's family of marks prior to that date. Accordingly, Opposer's family of marks was famous prior to Applicant's use of the mark MCSWEET.

---

[51] Opposer introduced 19 annual reports which ranged from 1986 – 2010. The reports were authenticated by Mr. Sterling who testified to the validity of the information in the reports. Exhibit 38 (McD010456) and Exhibit 20 (McD011509) to Sterling Test. The 1996 Annual Report, which included an eleven year summary of both sales and restaurants in the United States, revealed that in 1986 (the earliest year covered), Opposer operated 7,272 restaurants in the United States, which had sales of approximately $9,534,000,000. Exhibit 34 (McD007806) to Sterling Test. Further, Opposer extensively promoted its "MC" family of marks since 1974. O'Malley Test., 27:16-18 and Exhibit 73.

[52] Applicant alleged 1990 as the date of first use of the mark MCSWEET for pickled gourmet onions. To support this allegation, Applicant submitted a photocopy of what purports to be a newsletter from Marriott Corporation "stating that McSweet cocktail onions had been okayed for purchase by all beverage managers …" McCaslin Test., 15:1-24. Mr. McCaslin had no personal knowledge of the "newsletter" and testified about a conversation he had with Leon McIntyre. As such, the testimony, insofar as it reports Mr. McIntyre's statements, constitutes hearsay, as do the factual allegations in the "newsletter." Accordingly, neither Mr. McCaslin's testimony nor the "newsletter" is sufficient to establish 1990 as Applicant's date of first use of the McSweet mark.

Applicant provided no evidence of use or advertising prior to 2007 (McCaslin Test., 178:1-12, 186:16-21 and 189:4-190:9). However, Applicant testified that Mr. McCaslin, as a sole proprietor, first sold pickled cocktail onions in 1999 (*Id.,* 113:18-22); and that Applicant first sold garlic and olives in 2006 (*Id.*, 109:14 and 110:15-19); and asparagus in 2008 (*Id.*, 111:20-23).

**Is Applicant's use of the mark MCSWEET likely to cause dilution by blurring?**

"In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

> (i) The degree of similarity between the mark or trade name and the famous mark.
>
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
>
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
>
> (iv) The degree of recognition of the famous mark.
>
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
>
> (vi) Any actual association between the mark or trade name and the famous mark."

15 U.S.C. §1125(c)(2)(B)(i)-(vi).

**The degree of similarity between the mark or trade name and the famous mark.**

As established, Opposer's family of marks consists of the prefix "MC" combined with a generic or descriptive term. Applicant's mark meets the criteria that define Opposer's family of marks, inasmuch as it is comprised of the identical prefix, combined with the descriptive term "sweet." Applicant's mark MCSWEET is very similar to Opposer's family of marks.

**The degree of inherent or acquired distinctiveness of the famous mark.**

"This factor requires us to analyze how distinctive or 'unique' the mark is to the public. The inquiry is made even when it is undisputed that Opposer's mark is registered on the Principal Register." *NASDAQ Stock Mkt. Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718, 1735 (TTAB 2003). As discussed, *supra,* we have found that the combination of the prefix "MC" with a generic food name or a descriptive food term is inherently distinctive.

**The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.**

Opposer has established that its use of its "MC" family of marks is substantially exclusive. There is little relevant evidence of current use of third-party marks consisting solely of the prefix "MC" combined with a generic or descriptive term. As noted previously, Applicant made of record certain third-party marks using the "MC" prefix (e.g., McIlheney). With the exception of MOLLY McBUTTER, these marks were all derived from surnames, and do not follow the pattern of Opposer's family of marks. As for MOLLY McBUTTER, it does not consist solely of the prefix "MC" combined with a generic or descriptive term, but instead appears to be the full name, albeit fictitious, of a person or character. Moreover,

> [t]he law does not require that use of the famous mark be absolutely exclusive, but merely "substantially exclusive." *See L.D. Kichler Co. v. Davoil Inc.,* 192 F.3d 1349, 52 USPQ2d 1307, 1309 (Fed. Cir. 1999) (holding that in the trademark context, "substantially exclusive" use does not mean totally exclusive use). Therefore, a limited amount

of third party use is insufficient to defeat a showing of substantially exclusive use. *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 878 [51 USPQ2d 1801] (9th Cir. 1999) (finding that use of the mark was not substantially exclusive when the words "Avery" and "Dennison" were "*commonly* used as trademarks, both on and off of the Internet, by parties other than Avery Dennison." (emphasis added)).

*Nike Inc. v. Nikepal Int'l Inc.*, 84 USPQ2d 1820, 1827 (E.D. Cal. 2007). Further, Opposer has established that it has successfully implemented a comprehensive program to enforce its trademark rights in its "MC" family of marks,[53] for the purpose of limiting third-party uses of similar marks. We find that, even if not entirely exclusive, Opposer's use of its "MC" family of marks is substantially exclusive. *Cf. UMG Recordings, Inc. v. Mattel, Inc.,* 100 USPQ2d 1868, 1889 (TTAB 2011).

### The degree of recognition of the famous mark.

Opposer has established that the degree of recognition of its "MC" family of marks is and has been quite strong since as early as 1986, at which time Opposer operated 7,272 restaurants in the United States, which had sales of approximately $9,534,000,000.[54] Opposer has put extensive resources into developing and promoting the "MC" family of marks and has created an immediate association between the family of marks and itself. Opposer has continuously used "MC" formative marks since it adopted the mark EGG MCMUFFIN in 1973. *See* Sterling

---

[53] O'Malley Test., 42:19-56:6 (the particulars of the enforcement programs were submitted in the confidential portion of Ms. O'Malley's testimony).

[54] See footnote 54.

Test., 10:19-24. Further, Opposer has been promoting its family of marks since 1974, when it ran a national television commercial advertising the McDonald's "MC" formative family of marks by promoting its fictional "McLanguage." *See* O'Malley Test., 18:17 - 19:11. Promotion of the "McLanguage" was also prominent in a 1981 ad entitled "Presenting Ronald McDonald and Rockin' McLanguage." *Id.* at 23:19 – 24:16. Print advertisements stressing the "MC" element of the marks appeared in the mid-1990s and in 2004. *Id.* at 17:5-8, 27:16-18.. Further, it is common for Opposer and its local franchises to advertise multiple "MC" prefix marks in the same ad. Sterling Test., 144:13-145:10. As previously discussed, an enormous number of products are sold annually under each of Opposer's "MC" marks. Moreover, according to witnesses, Opposer's efforts to establish and maintain the "MC" family of marks have been so successful that consumers spontaneously use the "MC" prefix in connection with all of Opposer's products. *Id.* at 12:20-14:12. Accordingly, we find that Opposer has demonstrated a high degree of public recognition of its family of marks.

> **Whether the user of the mark or trade name intended to create an association with the famous mark.**

There is no evidence that Applicant intended to create an association with Opposer's family of marks.

> **Any actual association between the mark or trade name and the famous mark.**

Opposer retained Phillip Johnson to conduct a dilution survey. For the survey, Mr. Johnson focused on Applicant's mark "McSweet," which was used as the

47

test word, and "Mr Sweet," which was used as a control word. *See* Johnson Test., 21:5-18.

The subjects of the survey were consumers who had purchased pickled vegetables within the last six months, or who planned on purchasing pickled vegetables within the next six months. *Id*. at 22:10-23:1. The survey was conducted with people in "a shopping mall intercept kind of environment, which is people found in public spaces who are interviewed while they are out shopping or they are out doing something ...." *Id*. at 24:8-15 According to Mr. Sterling, "this is where most interviews that are done face to face are done. … [T]he mall intercept is usually the preferred way to do something when you want to have a visual stimuli and when there is any ambiguity about how it's shown ... [B]ecause we are doing this with ... the Mc formative, which is a capital M followed by a small C followed by another cap, it's best I think if you can, to show someone visually rather than to do it verbally." *Id*. at 25:13-22.

Mr. Johnson described the mechanics of the survey as follows:

> "Half of the interviews were conducted in markets where McSweet products are currently being sold ... in the Pacific Northwest, which included Portland, Oregon; Puyallup, Washington; Silverdale, Washington; and Auburn, Washington, which are in the Seattle-Tacoma metroplex, while the other half of the interviews are [sic] conducted in markets where McSweet could be sold ... outside of the Internet, ... which includes Chicago, Dallas, Jacksonville, Florida and New York." *Id*. at 26:16- 27:3.

> "There were 409 men and women ... interviewed in this study. They divided between the test cell, which was 307 and the control cell, which was 102." *Id*. at 29:5-9.

The test cell was shown the first placard below and the control cell was shown the second placard.



**Test Cell Exhibit**

McSweet

**Control Cell Exhibit**

Mr Sweet

At the start of the survey, the respondents were shown either the test card or the control card and then told: "This is the name of a product that you might see in a grocery store aisle. Feel free to comment on anything that strikes you about this, either positively or negatively."[55] The spontaneous comments were recorded and tabulated. Forty-six percent of the test cell respondents who responded spontaneously mentioned McDonald's when they saw the "McSweet" name. By contrast, no one mentioned McDonald's when they saw "Mr Sweet" in the control cell. *Id.* at 35:23-36:8 and Exhibit 111, p. McD 006670.

These responses were counted in the dilution results. *Id.* The cards were then removed and several distractor questions were asked. *Id.* at 36:9-18. Thereafter, all of the subjects were asked three likelihood of confusion questions:

---

[55] The statement and request for comments was designated "question 1" by the survey expert.

Question 4: "Based on what you just saw, do you OR don't you know who or what brand or company makes the product with the name that I showed you?";

Question 5: "Do you or don't you know of any other products or brands that are made by the same company that makes the product with the name that I showed you?" and

Question 6: "Do you believe that whoever makes the product with the name that I showed you is OR is not related to, sponsored by, or associated with any other brand or company?"[56]

*Id*. at 36:19-39:22 and Exhibit 111, pp. McD 006659-McD 006665.

The likelihood of confusion questions were followed by Question 7, the "dilution question": "What, if anything, came to your mind when you first saw this name?" *Id*. at 39:24-40:3. Following the dilution question, the subjects were asked: "Anything else? … What makes you say that?" *Id*. at 40:3-4.

In tabulating the survey, Mr. Johnson started with the source identifying questions 4-6, which determined confusion. He counted the respondents who identified "McDonald's" as the brand or company that makes the product with the name McSweet (question 4). Any respondents who identified "McDonald's" were not counted in the tabulation of responses to questions 5 or 6. More specifically, any respondents who had not identified "McDonald's" in response to question 4 but did identify "McDonald's" in response to question 5 were counted. Similarly, any respondents who had not identified "McDonald's" in response to questions 4 and 5

---

[56] There were also follow-up questions asked after each of the likelihood of confusion questions.

but did identify "McDonald's" in response to question 6 were counted. *Id*. at 51:5-52:5 and Exhibit 111, p. McD 006668. The results of the tabulations revealed that

> more than one in four or 26 percent of those people [current or prospective purchasers of pickled vegetables] falsely believe the product comes from or is related to McDonald's as the source of the product, which means that the McSweet name for grocery store products causes a significant likelihood of confusion with a false belief that such products come from or are offered in connection with McDonald's.

*Id*. at 57:17-24.

The 26% of respondents whose responses indicated there was a likelihood of confusion were not included in the calculation for dilution.

In terms of measuring dilution, Mr. Johnson utilized the responses to question 1 ("This is the name of a product that you might see in a grocery store aisle. Feel free to comment on anything that strikes you about this, either positively or negatively.") and question 7, ("What, if anything, came to your mind when you first saw this name?").

Ninety-four percent of the respondents in the test cell made spontaneous comments in response to question 1. Of those, 46% mentioned McDonald's. Forty percent of these respondents mentioned McDonald's because of "the 'MC' Part." Among the other reasons that respondents mentioned McDonalds were: "the name" (6%), "sounds like McDonald's" (5%), "reminds me of/think of McDonald's/Trademark" (4%), "current McDonald's Menu Item" (4%), "product from McDonald's" (2%), and "supported by/comes from McDonald's" (1%). *Id*. at 53:19-55:11 and Exhibit 111 p. McD 006672.

After eliminating the respondents who were confused about source, i.e., named McDonald's as the source of the product (consisting of 26% of <u>all</u> respondents in the test cell), the survey showed that 27% of the other respondents spontaneously mentioned McDonald's and thus associated the McDonald's name with McSweet but were not confused about source, i.e., did not think McDonald's was actually the source of the product. Ninety-eight percent of the respondents answered question 7. Of them, 55% named McDonald's. The respondents who named McDonald's in response to question 7 but not question 1 (i.e., were not confused about source) were tabulated. The results were 14%. By adding this 14% to the 27% who mentioned McDonald's in response to question 1, Mr. Johnson calculated that McDonald's came to mind in 41% of the respondents when they encountered the McSweet name for grocery store products. *Id.* at 55:12- 56:17 and Exhibit 111 McD 006673.

Opposer's expert contends that "the dilution question, was used in *Nike v. Nikepal* and a number of other survey protocols that have attempted to measure dilution and have been used by the courts as an accurate – or cited by the courts as an accurate measurement of dilution." *Id.* at 40:11-17 and Exhibit 111, p. McD006671.

Both the courts and the Board have found the "brings to mind" survey format acceptable as evidence of actual association, which is required to establish likelihood of dilution. *See Nike Inc. v. Nikepal Int'l Inc.*, 84 USPQ2d at 1825 ("Mr. Johnson a survey expert testified that his survey revealed that the vast majority of respondents, 87%, associated NIKEPAL with NIKE; that is, when they encounter

the mark NIKEPAL, they think of NIKE and/or its offerings."); *Nat'l Pork Bd. v. Supreme Lobster & Seafood Co.,* 96 USPQ2d 1479, 1491 (TTAB 2010).

In this case, the survey shows a substantial degree of association between MCSWEET and McDonald's and the "MC" marks, showing that "67% or two out of three individuals who encounter the MCSWEET term associate it with Opposer, McDonalds and its 'MC' marks." Johnson Test., at 56:6-11. *But see Rolex Watch U.S.A. Inc. v. AFP Imaging Corp.*, 101 USPQ2d 1188, 1196 (TTAB 2011), *vacated on other grounds*, *Rolex Watch U.S.A. Inc. v. AFP Imaging Corp.*, 107 USPQ2d 1626 (TTAB 2013) (42% was an insufficient level of actual association to prove a likelihood of dilution). The 67% figure is derived by adding the 26% of the respondents that identified McDonald's in response to one of the source questions (4, 5, or 6), without double counting, to the 41% of the respondents who were not confused about the source but indicated that McDonald's came to mind in response to one of the dilution questions (1 or 7). Where the respondent answered both sets of questions indicating both confusion and dilution, only one of the responses was counted. More specifically, the 41% number represents respondents who did not indicate confusion but did answer that the mark "called to mind" Opposer's marks. Further, of the respondents who mentioned McDonald's either as the source of the McSweet product or who said McDonald's came to mind when they saw the McSweet mark, the most frequent reason for the response was the "Mc" prefix of the McSweet mark. Johnson Test., 52:23-55:9 and Exhibit 11, pp. McD006668 and McD006672.

As such, the survey provides sufficient proof of an association arising from the similarity between the mark MCSWEET and Opposer's family of "MC" marks. This finding is confirmed by evidence of association consisting of consumers' references to Opposer's sweet tea product as "MCSWEET TEA."[57]

Applicant contends that the survey is "fatally flawed." The bases for this contention are: (1) "the physical placards that were used by the expert's survey takers to show the terms 'McSweet' and 'Mr Sweet' to survey respondents presented those words in the exact typographical font used by McDonald's in its most recognizable restaurant signage"; (2) Applicant's "pickled gourmet vegetable products" were identified as "pickled vegetables"; (3) Applicant's belief that a significant number of the survey respondents were "under the legal drinking age" and "hence are far more likely to be consumers of Opposer's products than of, for example, gourmet pickled onions for use in cocktails"; (4) Applicant's belief that the "distractor questions," which asked respondents about the stores in which they have shopped and the stores in which they plan on shopping, distracted the respondents' attention from the "grocery store context they were initially asked about" and re-focused their attention on the context of a shopping mall where McDonald's restaurants are often located; and (5) the questions asked about the products sold under the terms McSweet or Mr Sweet stated that the products were sold in grocery stores and supermarkets and did not indicate that they could also be sold in liquor

---

[57] *See* Opposer's 3rd Notice of Reliance and Exhibits L-145, 146, and 152 thereto.

stores, restaurants, bars, hotels, and on the Internet. Our findings on these objections are discussed below.[58]

> **Was the type font used on the physical placards in the survey the exact typographical font used by Opposer in its most recognizable restaurant signage?**

Applicant has submitted no evidence supporting this allegation. Moreover, the allegation was denied during the cross-examination of Mr. Johnson:

> Q. What type of font did you use for the exhibits?
>
> A. It's a plain font.
>
> Q. Is it similar to the font that McDonald's uses, this plain font you selected?
>
> A. I don't know.
>
> Q. Did you check?
>
> A. No. As I say, I always use a plain font when you test a term like this.

Johnson Test., 80:12-17 and 80:23-81:4. The following advertisements submitted by Opposer for its marks MCSKILLET, MCNUGGETS, and MCCAFE establish that the font used by Opposer is not "the exact typographical font" used on the placards in the survey:

---

[58] We note that Applicant did not proffer any expert testimony supporting these criticisms. While a party is not required to employ an expert to be able to direct criticisms to an opposing party's survey, having a qualified expert confirm that the criticisms reflect the relevant standards employed in the survey field would lend additional weight to such criticisms.



**Did the identification of Applicant's goods as "pickled vegetables" rather than "pickled gourmet vegetables" invalidate the survey results?**

As stated, *supra,* Applicant offered no evidence regarding the difference between "pickled gourmet vegetables" and "pickled vegetables*."* Moreover, Applicant offered no explanation about how vegetables are categorized as "gourmet" and why its vegetables would be considered gourmet.[59] As such, we conclude that

---

[59] Moreover, Applicant testified in its 30(b)(6) discovery deposition that "McSweet, LLC is in the business [of] production and distribution of gourmet pickled vegetables." McCaslin Depo., 57:23-24. Thus, Applicant itself does not distinguish between "pickled gourmet

the difference between "pickled vegetables" and "pickled gourmet vegetables" is at best negligible and the characterization of Applicant's products as "pickled vegetables" does not invalidate the survey results.

> **Does the possibility that a significant number of the survey respondents were "under the legal drinking age" invalidate the survey results?**

Our evaluation of Applicant's goods is based on the goods as identified in the applications, which are not limited to goods that would be consumed only by persons of legal drinking age. Moreover, the identifications of goods do not restrict the class of customers to drinkers of alcoholic beverages. Accordingly, the possibility that a number of the survey respondents were under the legal drinking age does not affect the results of the survey. Similarly, since the identifications of goods in the applications do not restrict the channels of trade to liquor stores, restaurants, bars, hotels, or the Internet, and Applicant's goods and other similar goods are sold in supermarkets, categorizing the test mark McSweet and the control mark Mr Sweet as "the name of a product that you might see in a grocery store aisle" does not invalidate the survey.

> **Did the distractor questions change the respondents' focus from grocery stores to shopping malls?**

There is no evidence that the distractor questions regarding the respondents' shopping experiences affected the respondents by making them focus on shopping

---

vegetables" and "gourmet pickled vegetables," which makes it impossible for us to determine what Applicant's means by the phrase, "pickled gourmet vegetables."

malls, which may include McDonald's restaurants, rather than on products sold in supermarkets.

### Were the survey results inaccurate because participants were counted twice?

Applicant asserted that in arriving at 67% "Opposer's expert failed to demonstrate that individuals were not counted as part of both the 26% [finding likelihood of confusion] and the 41% [finding dilution]." Applicant's Brief, p. 42. Applicant did not provide any evidentiary support for this assertion and it is directly contradicted by the survey results and Mr. Johnson's testimony. As was explained above, the figure of 67% was derived by adding together, without duplication, the number of survey subjects who gave responses indicating that they perceived Opposer as the source of the MCSWEET product to those indicating that they perceived an association with Opposer. In explaining the survey results, Mr. Johnson testified that the results were "unduplicated," which means "not counting someone twice." Johnson Test., 93:24–94:5. Therefore, the 41% who indicated a "brings to mind" association (dilution) did not include anyone from the 26% who indicated confusion as to source (likelihood of confusion). To accurately define the group that associated MCSWEET for a grocery store product with McDonald's, the figures were combined to show that 67% of the subjects associated the term MCSWEET with McDonald's, primarily because of the "MC" prefix.

In view of the above, and not-withstanding Applicant's objections, we find the survey demonstrates actual association between the mark MCSWEET and Opposer's family of "MC" marks.

**Conclusion.**

After considering all of the relevant factors, we find that Applicant's mark is likely to impair the distinctiveness of Opposer's family of "MC" marks and is therefore likely to cause dilution by blurring within the meaning of Section 43(c).

**Decision**: The oppositions are sustained on the grounds of both likelihood of confusion under Section 2(d) of the Trademark Act and dilution by blurring under Section 43(c)(2)(A) of the Act as to both applications, Serial No. 78947247 and Serial No. 77722272 and registration to Applicant is refused.